**2023 UT App 133**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellant,
*v.*
WILLIAM LANSING TAYLOR,
Appellee.

Opinion
No. 20210366-CA
Filed November 2, 2023

Third District Court, Salt Lake Department
The Honorable Heather Brereton
No. 191903574

Sean D. Reyes and Lindsey L. Wheeler,
Attorneys for Appellant

Freyja Johnson and Emily Adams,
Attorneys for Appellee

JUDGE JOHN D. LUTHY authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and RYAN M. HARRIS
concurred.

LUTHY, Judge:

¶1　　This is a witness tampering case. William Lansing Taylor and a former coworker (Colleague) are both geologists, and they worked for the same research institute (Employer) until Employer fired Taylor in the spring of 2018. When Taylor was later charged with multiple misdemeanors, the charging document for that case (Information) contained a summary of a statement given by Colleague that described an interaction the pair had at a professional conference. Upon reviewing the Information, Taylor sent Colleague a series of emails accusing her of lying and asking her to "renounce" her statement. Based on these emails, Taylor was charged with witness tampering. After a jury convicted

Taylor of this offense, the district court arrested judgment, concluding that there was insufficient evidence that Taylor had the mental state necessary to support a witness tampering conviction. The State now appeals, challenging the court's order arresting judgment. We conclude that when the evidence is viewed in the light most favorable to the jury's verdict, it was sufficient to support that verdict. We therefore reverse.


BACKGROUND

¶2      In May 2018, sometime after Employer terminated Taylor, both Taylor and Colleague attended a professional conference. While there, the pair had an interaction that Colleague found disturbing. Because of "ongoing problems" between Taylor and Employer's staff, Colleague reported the incident to her supervisor and then to the police.

¶3      Prior to the conference—in April 2018—the police had begun investigating Taylor. The investigation resulted in charges being filed against Taylor in a separate case, and Taylor first appeared in court on those charges on January 15, 2019. Taylor chose to represent himself at his arraignment, and he was there presented with the Information that included, in the probable cause statement, a summary of a statement given by Colleague describing the incident at the conference. That summary read:

> [F]ollowing a presentation [Colleague] gave[,] she was approached by [Taylor] in the main convention hall where he blocked her path, not allowing her to return to [Employer's] booth. [Colleague] states that she took an unusual path to avoid [Taylor], but he sought her out. During the conversation [Taylor] was irate and unstable. [Colleague] tried to get away from [Taylor] multiple times, but he stayed with her and often mentioned other . . . staff members [of Employer]. [Taylor] only left when he saw [Colleague's] coworkers approaching.

While this summary was included in the Information for Taylor's other case, none of the charges filed against Taylor in that case stemmed from the interaction between Taylor and Colleague at the conference.

¶4     Soon after he left his arraignment, Taylor began emailing Colleague. In his first email, sent at 9:33 a.m. the same day, he wrote:

> You provided false testimony. We did not have an altercation of any sort at [the conference]. I did not seek you out, I did not block your path, I was neither irate nor unstable, you did not try to get away multiple times and I did not pursue you. I can't believe you lied. You will now be subpoenaed and required to recount the true story in front of a Salt Lake City district cour[t] judge.

A second email contained only an attachment consisting of the portion of the Information summarizing Colleague's statement to police, as quoted above. A third email, sent at 2:44 p.m. on the same day, said:

> Because of your statement, I'm being prosecuted by the State of Utah[.] I face 2.5 years in prison, fines, and a permanent criminal record. None of my interactions with you warrant this attack nor these consequence[s]. Please renounce your statement.

¶5     Based on these emails, the State charged Taylor—in a case separate from the misdemeanors—with one count of witness tampering, a third-degree felony. The witness tampering case is the subject of this appeal, and it was tried before a jury in October 2019.

¶6     During trial, Colleague provided the following testimony in response to questioning by the State:

Q: [B]etween the time that the defendant had been terminated [by Employer] and this conference in May, had there been problems between the defendant and the staff [of Employer]?

A: There have been some emails that have been received [by] a different staff member and some ongoing problems.

Q: Okay. So given that, what were your feelings when you saw the defendant at this [conference] in May?

A: I was concerned. I was worried . . . .

Q: Okay. And at this conference when you saw him there, was there some sort of confrontation or incident that took place?

A: Yeah. We were in the main hall, and he blocked my path from moving through the hallway. I tried to move one way, he'd move that way. Again, tried to move another way, he'd move that way. And then some things were said, mostly in a very irate manner by Mr. Taylor.

¶7    The State asked about Colleague's reaction to Taylor's emails, and Colleague responded that she "was scared." The State asked why the messages made her feel scared, and she answered that the incident at the conference "had been a behavioral pattern" and "[t]here had been other things leading up to that as well." She continued, "And so when I got the email saying that I had lied and that I needed to recant those lies, I was scared." The State asked, "And . . . how did it make you feel about going forward with the statement that you had given to police?" Colleague responded, "I was scared to go forward." At this point, Taylor's counsel objected as to relevancy, and the court said, "I think it is

[relevant]. I'll overrule the objection." Colleague then further testified that she "didn't know whether to phone the police and say that [she] needed to recant the statement because [she] was worried of threatening behavior in the future." The State then asked, "So calling the police and recanting, is that something you considered as a result of these emails?" Colleague responded, "Yes."

¶8      On cross-examination, Taylor's counsel asked Colleague whether Taylor's statement that the pair "did not have an altercation of any sort" was correct, and Colleague testified that while there was no physical altercation, she "believe[d] that an altercation is any kind of aggressive behavior toward" a person and she "viewed [Taylor] blocking [her] path as aggressive." Taylor's counsel referred to Taylor's first email as describing his "version of events" and asked Colleague whether it was "fair to say that [she] disagree[d] with Mr. Taylor as to what happened that day." Colleague said, "Yes." Taylor's counsel then said, "Right. So . . . maybe there's a car wreck. Someone says the light's red. Someone says the light's green. They just think different things. So you believe that he viewed that differently?" Colleague responded, "I don't think he did. I think he's saying he did."

¶9      Taylor's counsel later asked Colleague, "Now, did [Taylor] ask you to tell a false story?" Colleague responded, "He has in the [third] email." Counsel replied, "No, no. But—no. He didn't say tell a false story, right?" Colleague responded, "Well, he says you need to recant the story . . . ." Counsel asked, "He said recant . . . what story?" Colleague responded, "The true story." Counsel also asked, "Did he ever say 'Don't answer a subpoena, don't respond to court'?" Colleague answered, "That's in the third [email], yes." Counsel pressed, "Where did he say don't go to court?" Colleague responded, "When it says 'Please renounce your statement.'"

¶10      After the State presented its case, Taylor's counsel moved for a directed verdict, arguing that the State had produced no evidence that Taylor had the intent "to induce or otherwise cause a person to testify or inform falsely," *see* Utah Code § 76-8-508(1),

because Taylor had merely said, in effect, "I want you to tell the true story. I believe your previous statement was false." The court indicated that it would take the motion under advisement but it would also proceed with the remainder of the trial.

¶11   Taylor testified in his defense. When asked why he accused Colleague of providing false testimony, he said, "Because I believed that the summary statement describes events that did not occur, and they were being used to charge me with a crime I did not commit." He read aloud from his first email his version of the events at the convention center. He also described how the alleged incident occurred in "[a] giant room" accommodating "[t]en thousand people," and he then testified that he "[a]bsolutely" did not block Colleague's path. He presented his statements in the third email as "correct factual statement[s]" and his asking Colleague to "[p]lease renounce [her] statement" as a request to "come to court, bring your statement with you and say that it has inaccuracies, that it's not a valid representation of the events that transpired on that day."

¶12   After Taylor testified, his counsel renewed his motion for a directed verdict. The court denied the motion, saying, "I do think that . . . it is a jury determination to determine Mr. Taylor's intent, also to consider the meaning of those words when taken in conjunction with each other, and I do find that a reasonable jury could interpret that [third] email as meeting the prima facia case for witness tampering." The jury then found Taylor guilty of witness tampering.

¶13   Before sentencing, Taylor moved to arrest judgment. Taylor again insisted that "the evidence shows only that the two had different perspectives about what had occurred, that Mr. Taylor believed [Colleague] was lying, and that he urged her to tell the truth."

¶14   After hearing oral argument on the motion, the district court informed the parties that it thought "that [it] erred" in admitting Colleague's testimony about how she felt upon

receiving the emails. The court explained, "The issue is . . . Taylor's mens rea, . . . whether he believed her statement was true and he was inducing her to change it," and said, "I don't think there's evidence by which a reasonable jury could find that[,] and that testimony . . . I believe was elicited from her . . . in error." The court said that without that testimony, it did not "think that there was enough evidence for the jury to make a determination that witness tampering occurred beyond a reasonable doubt." Accordingly, the court granted Taylor's motion to arrest judgment.

¶15   The State moved the court to reconsider its oral ruling. It argued that "[i]n considering different, competing inferences drawn from the evidence, this Court supplanted the jury as fact finder[], and thus substituted the Court's preferred reading of the evidence for the jury's" and that "[d]oing so was a violation of governing precedent and the . . . legal standard" applicable to a motion to arrest judgment, "which calls on courts to construe the evidence in one way only—as favorably as possible to the rendered verdict."

¶16   In its written ruling addressing both motions, the court determined that "a reasonable jury could not conclude that the elements of witness tampering had been met"—either "when considering the emails together" or when considering "the third email standing alone." The court concluded that "[b]ecause the evidence presented in this case does not sustain a reasonable inference that Mr. Taylor had the requisite mens rea to have committed witness tampering, . . . there was insufficient evidence for the jury to convict Mr. Taylor of witness tampering." The State appeals.

## ISSUE AND STANDARD OF REVIEW

¶17   The State contends that the district court erred when it arrested judgment. "[W]e review the district court's decision to

arrest judgment for correctness." *State v. Black*, 2015 UT App 30, ¶ 12, 344 P.3d 644.

ANALYSIS

¶18   "A district court may arrest a jury verdict when the evidence, viewed in the light most favorable to the verdict, is so inconclusive or so inherently improbable as to an element of the crime that reasonable minds must have entertained a reasonable doubt as to that element." *State v. Black*, 2015 UT App 30, ¶ 12, 344 P.3d 644 (cleaned up); *see also* Utah R. Crim. P. 23 ("At any time prior to the imposition of sentence, the court upon its own initiative may, or upon motion of a defendant shall, arrest judgment if the facts proved or admitted do not constitute a public offense, or the defendant is mentally ill, or there is other good cause for the arrest of judgment."). "This standard of review is highly deferential" to the jury's determination. *State v. Plexico*, 2016 UT App 118, ¶ 12, 376 P.3d 1080. "When reviewing the sufficiency of the evidence to sustain a conviction the question presented is not whether [a court] can conceive of alternative (innocent) inferences to draw from individual pieces of evidence, or even whether [it] would have reached the verdict embraced by the jury." *State v. Stricklan*, 2020 UT 65, ¶ 114, 477 P.3d 1251 (cleaned up). The court simply asks "whether the jury's verdict is reasonable in light of all of the evidence taken cumulatively, under a standard of review that yields deference to all reasonable inferences supporting the jury's verdict." *Id.* (cleaned up).

¶19   The jury in this case found Taylor guilty of witness tampering. The applicable statute indicates, in relevant part, that "[a] person is guilty of the third degree felony of tampering with a witness if, believing that an official proceeding or investigation is pending or about to be instituted," the person "attempts to induce or otherwise cause another person to: (a) testify or inform falsely" or "(b) withhold any testimony, information, document, or item." Utah Code § 76-8-508(1).

¶20 Additionally, a person is guilty of witness tampering only if the person acts intentionally, knowingly, or recklessly. *See id.* § 76-2-102; *State v. Whytock*, 2020 UT App 107, ¶ 45, 469 P.3d 1150, *cert. denied*, 481 P.3d 1043 (Utah 2021). A person acts (1) intentionally "when it is his conscious objective or desire to engage in the conduct or cause the result," (2) knowingly "when he is aware of the nature of his conduct or the existing circumstances" or "when he is aware that his conduct is reasonably certain to cause the result," and (3) recklessly "when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur" and the risk is "of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint." Utah Code § 76-2-103(1)–(3). Proof of one of these culpable mental states often "comes by way of circumstantial evidence, and proof of intent or knowledge is an inference that may be drawn by the factfinder both from direct and from circumstantial evidence." *State v. Mitchell*, 2013 UT App 289, ¶ 29, 318 P.3d 238 (cleaned up). "When the mental state is proven by circumstantial evidence, we examine whether the State presented any evidence that the defendant had the requisite intent or knowledge," along with "whether the inferences that can be drawn from that evidence have a basis in logic and reasonable human experience sufficient to prove that the defendant possessed the requisite intent." *State v. Florez*, 2020 UT App 76, ¶ 18, 465 P.3d 307 (cleaned up).

¶21 Here, the district court ultimately concluded that "the evidence presented" did "not sustain a reasonable inference that Mr. Taylor had the requisite mens rea to have committed witness tampering." We disagree.

I. The Attempt to Induce Colleague to Testify or Inform Falsely

¶22 The text of Taylor's emails supported a finding that Taylor was trying to manipulate Colleague into telling a false version of the facts. The first email was accusatory, and the jury could have

inferred from it Taylor's intent to create feelings of guilt when he said, "I can't believe you lied" and fear when he warned, "You will now be subpoenaed." The jury could have inferred an intent to induce feelings of guilt from the text of Taylor's third email as well where it laid the blame for his prosecution at Colleague's feet by saying, "Because of your statement, I'm being prosecuted." Additionally, because the third email did not explicitly ask Colleague to tell the truth, the jury could have read it as a bid for sympathy to convince Colleague that—whatever happened at the conference—the stakes were so high for Taylor that Colleague should tell a story she did not believe: "I face 2.5 years in prison, fines, and a permanent criminal record. None of my interactions with you warrant this attack nor these consequence[s]." Taylor's beseeching use of "[p]lease" immediately following such a bid for sympathy also comports with an interpretation of the emails as together constituting an intentional attempt to emotionally manipulate Colleague into changing her statement because of the consequences Taylor was facing, not because the statement was untrue. While alternative inferences might be drawn from the emails, the jury was "entitled to draw all reasonable inferences from the facts and from the actions of the defendant," *State v. Stricklan*, 2020 UT 65, ¶ 105, 477 P.3d 1251 (cleaned up), and the court was required to interpret the emails and the inferences that could be drawn from them in the light most favorable to the jury's verdict, *see id.* ¶ 114.

¶23 Moreover, the interpretation we have identified in favor of the jury's verdict is bolstered by the broader context in which the emails were sent. During trial, Colleague was asked, "[B]etween the time that the defendant had been terminated [by Employer] and this conference in May, had there been problems between the defendant and the staff [of Employer]?" She responded, "There have been some emails that have been received [by] a different staff member and some ongoing problems."[1] From this testimony,

---

1. The court and counsel for both parties discussed in a sidebar at trial how some related evidence might be inadmissible under rule

(continued…)

the jury could have inferred that Colleague was aware of troubling emails Taylor had sent to other former coworkers, and it could have inferred that Taylor became aware of Colleague's knowledge on this point when he saw Colleague's statement summary included in the Information for his other case. Thus, the jury ultimately could have inferred that Taylor knew Colleague would likely feel fearful upon receiving a series of accusatory emails from him—fearful that she would continue to receive such emails until she agreed to withhold her testimony or testify as he wished. *See generally id.* ¶ 106 ("When intent is proven by circumstantial evidence, we must determine . . . whether the inferences that can be drawn from that evidence have a basis in logic and reasonable human experience sufficient to prove that [the] defendant possessed the requisite intent." (cleaned up)). In this broader context, therefore, Taylor's very act of sending repeated emails to Colleague might have reasonably informed the jury's understanding of whether he intended "to induce or otherwise cause" her to testify falsely through emotional manipulation. Utah Code § 76-8-508(1)(a); *see also Stricklan*, 2020 UT 65, ¶ 106 ("The criminal intent of a party may be inferred from . . . *conduct before and after the offense*." (cleaned up)).

¶24   Perhaps more importantly, because of the jury's verdict, we must also assume that the encounter at the conference unfolded as Colleague described, and when we do, Taylor's subsequent request to Colleague to say that it unfolded differently is substantial evidence of him knowingly asking her to testify falsely. The case of *State v. Plexico*, 2016 UT App 118, 376 P.3d 1080, is instructive on this point. There a defendant appealed a witness tampering conviction, arguing that it was not supported by sufficient evidence. *Id.* ¶ 11. The witness and the defendant had reported two plainly incompatible versions of the same event: the

---

404(b) of the Utah Rules of Evidence. However, Taylor's counsel did not raise an objection to the questioning or testimony relayed here. Moreover, rule 404(b)(2) provides that evidence otherwise barred by rule 404(b) may be admitted for various purposes, including to prove intent. *See* Utah R. Evid. 404(b)(2).

witness had reported that the defendant had hit the defendant's boyfriend, while the defendant had claimed that she did not hit the boyfriend. *See id.* ¶¶ 16–17. The witness then testified that the defendant subsequently asked her to change her story and say that the defendant had not hit the boyfriend. *Id.* ¶ 16.

¶25 The *Plexico* court reasoned that when the jury was asked to determine whether the defendant was guilty of witness tampering, it was "implicitly . . . charged with determining whether [the defendant's] asking [the witness] to tell the police officer [that the defendant] did not hit [the] boyfriend was equivalent to [the defendant] asking [the witness] to inform or testify falsely." *Id.* ¶ 18 (cleaned up). The court then held that because "there was sufficient evidence that [the defendant] hit [the] boyfriend and asked [the witness] to testify otherwise," there was sufficient evidence to support a guilty verdict on the tampering with a witness charge. *Id.* (cleaned up). In other words, where there was evidence that the defendant asked the witness to testify to one of two plainly incompatible versions of events and the jury had sufficient evidence to determine that the version the defendant espoused did not happen, the evidence was sufficient to support a conviction of witness tampering. *See id.*

¶26 The same reasoning applies here. Taylor asked Colleague to give one of two versions of events that the jury could have found were plainly incompatible. One version was that at the conference, Taylor, among other things, spoke irately to Colleague and blocked her path multiple times by placing his body directly in front of hers as she walked. The other was that Taylor "[a]bsolutely" did not block Colleague's path and was not "irate." Because the jury had sufficient evidence to determine that Colleague's version actually happened and that Taylor asked her to testify otherwise, we—like the *Plexico* court—"cannot conclude that reasonable minds must have entertained a reasonable doubt about the essential elements of the tampering with a witness charge." *Id.* (cleaned up).

¶27    Taylor essentially argues that his version of events and Colleague's version of events were not plainly incompatible but, rather, demonstrated a mere difference of interpretation concerning the pair's interaction at the conference. But this argument is belied by Taylor's emails. They do not assert a difference of interpretation; they flatly contend that Colleague's account is "false testimony." In his first email, Taylor gave a point-by-point refutation of Colleague's summarized statement. Where Colleague said that Taylor approached her and blocked her path, Taylor claimed, "I did not block your path." Where she said that "he sought her out," Taylor contended, "I did not seek you out." Where she stated that he was "irate and unstable," he insisted, "I was neither irate nor unstable." And where she said that she "tried to get away from [him] multiple times, but he stayed with her," he averred that she "did not try to get away multiple times" and he "did not pursue" her. In the first email, Taylor contended that he and Colleague "did not have an altercation of any sort." Then in his third email, instead of asking Colleague to clarify aspects of her statement or renounce parts of it, Taylor asked her to renounce it entirely. Taylor's emails simply do not present the possibility of an honest difference of interpretation regarding an ambiguous encounter but, rather, a version of events that was plainly incompatible with Colleague's.

¶28    Moreover, beyond the emails, Colleague testified that in the main hall at the conference, Taylor blocked her path in that, as she "tried to move one way, he'd move that way" and that when she "tried to move another way, he'd move that way" too. In response, Taylor did not admit to moving side to side in front of Colleague, nor did he assert that his movements had been misinterpreted. Instead, he testified that the venue was vast—"[a] giant room" accommodating "[t]en thousand people"—implying that Colleague could have walked anywhere she wanted and that on the whole Colleague's summary of the interaction "describe[d] events that *did not occur*"—not events that occurred but were ambiguous. (Emphasis added.) Finally, Colleague testified that she did not believe Taylor viewed their conference interaction differently than she did; instead, she testified that she thought

Taylor was simply claiming that he did. In this regard, Taylor's counsel asked, "So . . . maybe there's a car wreck. Someone says the light's red. Someone says the light's green. They just think different things. So you believe that he viewed that differently?" And Colleague responded, "I don't think he did. I think he's saying he did."[2]

¶29 In sum, the jury could have reasonably viewed Taylor's emails and the other evidence at trial as foreclosing his defense based on a claimed difference of interpretation regarding ambiguous facts, and there was sufficient evidence to support a finding that Taylor knowingly, intentionally, or recklessly attempted to induce Colleague to testify or inform falsely.

## II. The Attempt to Induce Colleague to Withhold Testimony

¶30 Even if Taylor was convinced of the truth of his version of events, the jury still could have reasonably determined that he committed witness tampering by asking Colleague to "renounce" her statement. While Taylor would have needed to be aware that he was asking Colleague to testify falsely to satisfy Utah Code section 76-8-508 subsection (1)(a), *see State v. Plexico*, 2016 UT App 118, ¶ 13, 376 P.3d 1080 ("[T]he statute explicitly requires the jury to determine that [a defendant] asked [a witness] to 'testify or inform falsely,' as opposed to testify or inform truthfully."), subsection (1)(b) can be satisfied even if a defendant holds a genuine belief that a witness is lying, as long as the defendant "attempts to induce or otherwise cause" the witness to "withhold any testimony," Utah Code § 76-8-508(1)(b).

---

2. This testimony, which is essentially an opinion about Taylor's truthfulness on a particular occasion, was elicited by Taylor's counsel with no objection lodged. We are not expressing an opinion on its admissibility if it had been objected to. But because it was admitted without objection, the jury was rightly able to consider it.

¶31 One possible reading of Taylor beseeching Colleague to "renounce" her statement is that she should refuse to testify in the case. The word "renounce" means "to give up, refuse, or resign usually by formal declaration." *Renounce*, Merriam-Webster, https://www.merriam-webster.com/dictionary/renounce [https://perma.cc/KS9C-RDSB]. The timing of Taylor's request is important in interpreting Taylor's meaning. Colleague's statement was taken from her report of Taylor's behavior to the police. Accordingly, both Taylor and Colleague could have reasonably believed that Colleague could return to the police, formally renounce her statement, and refuse to testify in line with her statement.

¶32 While Colleague could have been subpoenaed and required to testify if the case went forward, the State could also have chosen to proceed without her testimony or to drop the charges against Taylor rather than work with an uncooperative witness.[3] Taylor's third email supports a reading that he sought

---

3. Common sense and a simple online search would inform a witness that convincing a prosecutor that the witness's original report to police was not accurate may result the case being dropped. *See, e.g.*, *Dropping Criminal Charges in Utah*, Stephen W. Howard PC, https://www.howarddefense.com/faq/can-i-drop-criminal-charges-after-they-have-been-filed.html [https://perma.cc/7W7M-KLN8]. While the decision to drop charges ultimately lies with the State, and while there are, of course, risks for a witness who recants, it is reasonable that a lay jury could interpret Taylor's emails as asking Colleague to do this.

Furthermore, if Colleague had refused to testify to any wrongdoing by Taylor and the State was not able to convince or compel her to do so, her statement to police may have been inadmissible as hearsay. *See* Utah R. Evid. 801(c) ("'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."); *id.* R. 802 ("Hearsay is not admissible except as

(continued…)

Colleague's refusal to testify at all when it stated that he was being prosecuted "[*b*]*ecause of* [her] statement." (Emphasis added.) This implies that without her statement, Taylor would not be prosecuted. So while the first email states that Colleague "will now be subpoenaed and required to recount the true story" in court, Taylor's later email can be read as providing Colleague a way to avoid that fearful situation. And indeed, Colleague testified that she interpreted the emails as asking her not to testify. She responded to Taylor's counsel's question, "Did he ever say 'Don't answer a subpoena, don't respond to court'?" with, "That's in the third [email], yes," and the follow-up question, "Where did he say don't go to court?" with, "When it says 'Please renounce your statement.'" The jury could have reasonably agreed with this interpretation.

¶33 Therefore, given the facts of this case, it is a reasonable reading of Taylor's emails that—even if he believed that his version of the facts was accurate—he committed witness tampering by asking Colleague to withhold her testimony. *See State v. Burk*, 839 P.2d 880, 885 (Utah Ct. App. 1992) ("[Trial] testimony demonstrates that [the defendant] asked [the witness] to testify that [the witness] . . . knew nothing about [the crime]. By doing so, [the defendant] not only attempted to induce or otherwise cause [the witness] to testify falsely, but also attempted to induce or otherwise cause him to withhold critical testimony

---

provided by law or by these rules."); *cf. State v. Garrido*, 2013 UT App 245, ¶¶ 17–18, 314 P.3d 1014 (explaining that the exception in rule 804(b)(1) permitting admission of prior testimony given by an unavailable witness—including one who "refuses to testify"— is still subject to confrontation rights and therefore only "admissible in a criminal trial if the defendant had a prior opportunity to cross-examine the witness" (cleaned up)), *cert. denied*, 320 P.3d 676 (Utah 2014). If this had happened, Taylor's attempt to weaken the State's case against him would have succeeded.

about the crime." (cleaned up)), *cert. denied*, 853 P.2d 897 (Utah 1993).

<hr>

CONCLUSION

¶34 The court erred when it failed to view the evidence "in the light most favorable to the verdict." *See State v. Black*, 2015 UT App 30, ¶ 12, 344 P.3d 644 (cleaned up). Appropriately considered, the evidence before the jury was sufficient to support its finding that Taylor had the requisite mental state to commit witness tampering. Because the evidence was not "so inconclusive or so inherently improbable as to an element of the crime that reasonable minds must have entertained a reasonable doubt as to that element," *see id.* (cleaned up), the court's action of arresting judgment was improper. Therefore, we reverse and remand this matter to the district court with instruction to reinstate the jury's verdict.

—————