**2024 UT App 96**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellant,
*v.*
KEVIN LEWIS,
Appellee.

Opinion
No. 20210661-CA
Filed July 11, 2024

First District Court, Logan Department
The Honorable Angela Fonnesbeck
No. 191101288

Sean D. Reyes and Jeffrey D. Mann,
Attorneys for Appellant

Emily Adams, Freyja Johnson, and
Melissa Jo Townsend, Attorneys for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGE AMY J. OLIVER concurred. JUDGE RYAN D. TENNEY
dissented, with opinion.

ORME, Judge:

¶1     The State charged Kevin Lewis with one count of rape, alleging that some thirteen years earlier he had sex with his then-fiancée (now ex-wife), Jane,[1] while she slept. Prior to filing charges, the prosecutor and law enforcement arranged for Jane to discuss the underlying allegations with Lewis in a recorded phone call. Because the conversation would violate a protective order Jane had obtained against Lewis, the county attorney

---

1. A pseudonym.

committed beforehand not to charge Lewis for the protective order violation.

¶2 The recorded conversation was the impetus for the charges against Lewis, and he subsequently moved the district court to suppress the recording of the phone call. The court granted his motion on three grounds, including under rule 403 of the Utah Rules of Evidence. Shortly afterward, the State dismissed its case against Lewis and filed the current appeal challenging the court's suppression order. Because we conclude the district court did not exceed its discretion in suppressing the recording under rule 403, we affirm.

BACKGROUND

¶3 Lewis and Jane began dating in 2005. According to Jane, they engaged in consensual sex at the beginning of their relationship but decided in late 2005 to abstain from sex for a year so that they could be married in a religious ceremony. They married in 2007 but divorced just short of ten years later.

¶4 In 2016, a few months before the divorce was finalized, Jane sought, and the district court[2] granted, a protective order against Lewis.[3] The protective order prohibited Lewis from, among other things, contacting or "communicat[ing] in any way" either directly or indirectly with Jane "except [for] civil written communication including email & text messages regarding [their]

2. The judge who granted the protective order is not the same judge who presided over the criminal proceedings in this case.

3. The record does not reveal the basis for the district court's grant of the protective order against Lewis. But the record does show that Jane at some point accused Lewis of domestic violence, although the allegation went uncharged.

minor children." The protective order was still in place at the time police investigated and the State charged Lewis in the criminal matter at issue here.

*The Allegations*

¶5      In 2019, Jane reported to police that Lewis had raped her in her sleep thirteen years earlier when they were engaged. At the subsequent preliminary hearing, Jane testified that she had difficulty sleeping and, on an almost daily basis, she took over-the-counter sleep aids that made her "very drowsy" and helped her reach "heavy or deep" sleep. She stated that back in 2006, Lewis would also help her fall asleep by comforting her and making her "feel like it was okay to go to sleep." Lewis would typically do so either by lying next to her on top of the covers while she was underneath the covers or by kneeling beside the bed. Jane stated that they had agreed beforehand that Lewis was to go home after she fell asleep.

¶6      Jane alleged that during this time, she began having "dreamlike memories" and "fragmented recollections" of Lewis "being pressed up against [her] underneath the covers, pulling [her] pants down or pulling his pants up, getting out of bed and straightening the covers." Although Jane was not sure how many times she had such memories, she stated that it was "more than once." She also testified Lewis became "really upset" when she once mentioned these memories to him, and he told her she "must have dreamed that." Jane stated that his reaction caused her to "feel really terrible" about herself and to question her "frame of mind in thinking that he would do something like that."

¶7      Jane testified that years later, during their marriage, Lewis sought counseling for pornography and sex addiction. She alleged that in 2015, as part of the twelve-step recovery process, he shared with her "a list of his moral inventory wrongdoings," including that when they were engaged, he had had sex with her

while she was sleeping. He did not provide her with any more details beyond that disclosure. Jane stated that this disclosure contributed to their divorce a year later. When asked why she waited until 2019 to report these allegations to the police, Jane responded that she and Lewis were working on issues in their marriage at the time and that she was concerned for her and her children's safety. She further explained that after the divorce was finalized in 2016, she still had safety concerns and that "it took seeing a . . . therapist to be able to even face the trauma of what [she] had experienced."

*The Recorded Phone Call*

¶8 After reporting these allegations to the police, Jane agreed to aid them in their investigation by participating in a recorded phone call with Lewis. Because the protective order allowing only written communications regarding their minor children was still in place, the county attorney "granted permission for a confrontation phone call to occur" by confirming with the police that no charges would be brought against Lewis for violating the protective order when he spoke with Jane over the phone.

¶9 In September 2019, Jane called Lewis from the police station. The phone call lasted a little over 19 minutes. When Lewis answered, Jane stated, "Hi, Kevin. I was just wondering if I could get you to listen on the phone to me for a little bit? I know I'm taking a chance calling you, but I just need to talk to you for a few minutes." Lewis responded, "Sure." What followed was a brief discussion about their children, after which Jane stated that the reason she wanted to speak with him was she thought "that things would be a lot easier on the kids if [they] were able to get along and talk more," and she asked whether she could speak to him "about a couple of things" she was "trying to work through so that" they could "move past some things." Lewis answered, "Okay."

¶10    Jane then stated that she was "having a really hard time" accepting the fact that during the time they were supposed to be abstaining from sex, he "would have sex with" her while she "was asleep." She said she felt guilty because they had nonetheless married in a religious ceremony, and she asked whether he felt the same. Lewis answered, "That is stuff I've worked through for several years. So for me . . . I feel like it's been dealt with and taken care of, addressed properly. But not with you, I guess." As the conversation continued, the following was said:

> [Jane]: . . . . I'm just really struggling with what you did to me.
>
> [Lewis]: Well, I am sorry.
>
> [Jane]: Why did you think it was okay to do that to me while I was asleep?
>
> [Lewis]: I don't recall the thinking that I was having back then, but I do know that those thoughts, those patterns were wrong, and that's part of what I've gone through to fix in my life and put in my past.
>
> [Jane]: I understand that it's in the past and it's something that you've worked through. It's just something that I'm still suffering with and hurting from. And so—
>
> [Lewis]: Well, like I said, I'm sorry. I've done a lot of wrong things and a lot of bad things. And frankly there's nothing that I can do that will, I don't know, provide any sort of restitution. That ship has sailed long ago for us.

¶11    Jane then asked Lewis to give his "perspective" on what happened. Lewis replied, "I am not in a position to give you any of my perspective on it. I'm sorry." Jane then asked whether it was

something he had sought counsel from religious leaders regarding, and Lewis responded, "Yes." Jane then said she still did not understand why he thought that what he did was "okay," to which Lewis responded, "I haven't said I thought it was okay. I said it was wrong and I'm sorry." When Jane countered that speaking to her about it was also part of the process of repentance, Lewis said, "technically this conversation shouldn't be happening because it's not about the kids." Jane then said, "I know I'm taking a really big risk talking to you," at which point Lewis interrupted her stating, "I'm the one taking the risk. Because you could at any moment call the police and say that we had this conversation. And it makes me extremely uncomfortable that you have that leverage against me when it was completely uncalled for."

¶12    Jane reassured Lewis that she would not report the conversation to the police and stated that the protective order "applies to me just as much as it applies to you."[4] Jane continued to press him further, stating that she was "trying to get past this" for their children's benefit. She asked him, "[D]o you remember when you were going to your self inventory and you shared with me about having sex with me while I was asleep?" Lewis's response is unclear.[5] Jane also stated that she had been going to therapy and was trying to talk to him about it so that she could "have a chance to heal and move on." Lewis then stated, "I don't

---

4. This statement was not accurate. The protective order prohibited Lewis from contacting or communicating with Jane in any manner other than "civil written communication including email & text messages" pertaining to discussion of their children. The order did not prohibit Jane from contacting or communicating with Lewis.

5. The transcript of the recording has Lewis's response as "Uh-huh." But in listening to the recording, his response sounds more akin to "Mmmhmm," although it is not entirely clear due to background noise and the fact that he says it rather softly.

know if there's anything you're expecting me to say, but I don't have much to say about the matter."

¶13    Jane then directly asked him, "How did you keep me from knowing?" Lewis answered, "Not sure. It's part of the lies and the secrecy of the addiction, I guess." Jane then asked what would have happened if she had become pregnant and whether he had used contraception. Lewis answered that "[n]othing was used" and with further prompting stated that he never ejaculated inside her.

¶14    Jane asked whether he loved her at the time. After Lewis confirmed that he did, Jane asked, "I'm just trying to reconcile if you loved me why you would rape me?" Lewis answered, "I didn't view it as that." He further stated, "At the time I'm not entirely certain I even thought about it. A lot of times I'd ask you if you wanted it and you'd mumble yes." He also said he could not remember ever not asking her for permission but that she was "[p]ossibly" asleep. Jane then pressed him about not being able to give consent while asleep. At this point Lewis stated, "I'm not comfortable anymore with how this conversation has been going. It's not about the kids and it's too risky for me." They then said their goodbyes, and the phone call ended.

¶15    That same day, Lewis sent Jane an email stating, "I don't mind talking more if you desire, but the [protective order] must go in order for me to feel more at ease talking about anything other than the kids. I'll leave that entirely up to you though. No pressure."

¶16    Not long after the phone call, law enforcement contacted Lewis to arrange for an interview, but he said he would not agree to an interview without his attorney being present. No interview was scheduled. Lewis's attorney indicated that Lewis would prepare a statement but later stated that they would not be issuing a statement. In December 2019, the State charged Lewis with one

count of rape. At the preliminary hearing, Jane testified as summarized above, and the recording of the phone call was played. The district court bound Lewis over for trial.

*The Motion to Suppress and the District Court's Ruling*

¶17 Lewis moved to suppress the recording of the phone call. In relevant part, he argued that the recording should be suppressed under the exclusionary rule because it was "the product of unlawful law enforcement activity." Specifically, he asserted that the State, the police, and Jane "engaged in what amounts to a criminal conspiracy" by inducing him to violate the protective order. He also argued that the recording should be excluded under rule 403 of the Utah Rules of Evidence because his answers were ambiguous and "[f]earing a protective order violation, he could not adamantly deny [Jane's] accusations as he would if he were able to speak freely." And in a supplemental memorandum, Lewis additionally argued the conduct by which the recording was obtained shocked the conscience because the purpose of the call "was to induce [him] into making incriminating statements without him knowing that he was being recorded and without the assistance of counsel, all while the state actors knew that the protective order would limit [his] responses."

¶18 The State opposed the motion, arguing—among other things—that the recording was "lawfully obtained" and that Lewis's criminal conspiracy accusation was "absolutely absurd" given that the county attorney had committed not to press charges for the protective order violation and no such charges had ever been filed. Regarding rule 403, the State contended that the probative value of Lewis's statements was "extremely high" and that it was not substantially outweighed by any risk of unfair prejudice. The State also argued that "facilitat[ing] a recorded phone call . . . while there was a protective order in place" after

the county attorney "essentially granted immunity" to Lewis did not rise to the level of shocking the conscience.

¶19 The district court agreed with Lewis's arguments and suppressed the recording on three grounds. First, following a discussion of the totality of the circumstances, the court held that the statements Lewis made during the phone call "were not made freely, voluntarily, and without compulsion or inducement of any sort." In this context, the court stated that the conduct in obtaining the recording was "so offensive to a civilized system of justice that the Court will not condone the techniques by allowing their fruits to be used as evidence against [Lewis] during a criminal trial."

¶20 Second, the court found "that the actions of law enforcement and its agent to obtain the recorded phone call shock the judicial conscience." In so ruling, the court opined that their actions were deliberate and that "[w]hat is most egregious is that each of the actors knew that the presence of the Protective Order prohibited [Lewis] from fully and confidently responding to and refuting [Jane's] many leading questions and confrontational assertions." The court also found that their actions were arbitrary and unrestrained—arbitrary because other investigative techniques, such as removing the protective order or having a detective interview Lewis, were available, and unrestrained because the "protective order was meant to restrain the very type of conversation that the actors sought to entrap [Lewis] into participating" in. The court further found that the conduct met "the high level of outrageousness for a number of reasons." Among other things, the court noted that "[o]ur judicial system depends on its order being enforced," and the court rhetorically asked, "What is the point of the Court issuing any order if law enforcement will only respect or enforce it at their convenience, when and if they see fit, or purposefully cause its violation?" Finally, the court found that Lewis was harmed by the actions.

¶21 Third, and most relevant given our resolution of this appeal, the court ruled that the recording should be excluded under rule 403. The court found that Lewis's statements during the phone call had "little probative value" for the following reasons:

- Lewis "appear[ed] hesitant to continue answering [Jane's] questions and accusation," and he brought up the protective order that prohibited him from speaking with her.

- Lewis's statements were "short, brief, and in response to the leading questions asked and emotionally charged assertions made by" Jane.

- Some of Lewis's statements "wherein he discusses his struggle with sex addiction and admits to having sexual intercourse with" Jane were ambiguous. But these facts were already undisputed, and Lewis expressly denied having sex without Jane's consent. Accordingly, the "information [was] already before the Court and could potentially be provided to a jury without the recorded phone call."

¶22 The court also ruled that the risk of unfair prejudice was "substantial" because "given the egregiously unfair nature of the investigative techniques used to obtain the recorded phone call, [Lewis], by law, was not at liberty to fully and confidently respond to and refute the barrage of leading questions asked and confrontational assertions made by" Jane. The court also found that the risk of the jury being misled was "substantial" because the ambiguity of some of Lewis's statements could cause the jury "to believe that [he] is knowingly and freely admitting to participating in sexual intercourse with [Jane] without her consent rather than merely admitting to participating in consensual sexual intercourse with" her. Lastly, the court found that there was a

"substantial" risk the jury would confuse the issue of nonconsensual and consensual intercourse due to the ambiguity of some of Lewis's statements "combined with the nature of [Jane's] accusations and the unique sexual history of the parties." Accordingly, the court ruled that those three risks substantially outweighed the recording's low probative value.

¶23 Following the district court's suppression order, the court dismissed the criminal case against Lewis on the State's motion because the prosecution's case was "substantially impaired" by the suppression of the recording. The State timely appealed.

## ISSUE AND STANDARD OF REVIEW

¶24 The State challenges the district court's decision to exclude the recorded phone call under rule 403 of the Utah Rules of Evidence.[6] We review a district court's ruling on the admissibility of evidence under rule 403 for an abuse of discretion. *State v. Beverly*, 2018 UT 60, ¶ 23, 435 P.3d 160. Under this standard, a district court has "freedom to make decisions which appellate judges might not make themselves ab initio," abusing its discretion only if its decision "was beyond the limits of reasonableness." *State v. Boyd*, 2001 UT 30, ¶ 40, 25 P.3d 985 (quotation simplified).

---

6. The State also challenges the other two grounds on which the district court based its decision to exclude the phone call, namely, that Lewis's statements were involuntary and that police conduct in obtaining his statements through a phone call that violated the protective order shocked the judicial conscience. Because we affirm the court's decision to exclude the recorded phone call under rule 403, we have no need to reach these other arguments.

ANALYSIS

¶25     In determining the admissibility of evidence under rule 403 of the Utah Rules of Evidence, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." This analysis generally consists of two steps. *State v. Nunez-Vasquez*, 2020 UT App 98, ¶ 58, 468 P.3d 585, *cert. denied*, 474 P.3d 945 (Utah 2020).

¶26     Under the first step, the district court assesses the probative value of the challenged evidence. *Id.* "The probative value of evidence is judged by the strength of the evidence and its ability to make the existence of a consequential fact either more or less probable and the proponent's need for the evidence." *Anderson-Wallace v. Rusk*, 2021 UT App 10, ¶ 19, 482 P.3d 822 (quotation simplified), *cert. denied*, 496 P.3d 716 (Utah 2021). It is also "appropriate to consider the availability of other, less prejudicial, means of proof." *State v. Hood*, 2018 UT App 236, ¶ 50, 438 P.3d 54. "If an evidentiary alternative has equal or greater probative value and poses a lower risk of unfair prejudice, the trial court should discount the probative value of the disputed evidence and exclude it if the risk of unfair prejudice substantially outweighs its discounted probative value." *Id.* (quotation simplified). But "if the relative need for the evidence is critical, the court is less likely to exclude it under rule 403." *Nunez-Vasquez*, 2020 UT App 98, ¶ 58 (quotation simplified).

¶27     Under the second step, trial courts assess the danger posed by the listed countervailing factors, including, as relevant here, unfair prejudice, confusing the issues, and misleading the jury. *Id.* "Unfair prejudice within the context of rule 403 means an undue tendency to suggest decision on an improper basis." *Anderson-Wallace*, 2021 UT App 10, ¶ 18 (quotation simplified).

Because the probative value of the evidence must be "substantially outweighed" by the risk of any of the enumerated countervailing factors, courts "indulge a presumption in favor of admissibility" when engaging in a rule 403 balancing test. *State v. Green*, 2023 UT 10, ¶ 78, 532 P.3d 930 (quotation simplified).

¶28　On appellate review, as previously noted, "we allow trial courts considerable freedom in applying rule 403 to the facts, freedom to make decisions which appellate judges might not make themselves ab initio but will not reverse." *State v. Boyd*, 2001 UT 30, ¶ 40, 25 P.3d 985 (quotation simplified). "The trial court is granted broad discretion when weighing the probative value of evidence against the reasons for exclusion enumerated in rule 403." *Francis v. National DME*, 2015 UT App 119, ¶ 34, 350 P.3d 615 (quotation simplified). Indeed, we will affirm cases in which "we can imagine two equally reasonable trial court judges reaching different conclusions about the admissibility of [the] evidence under rule 403 in the exercise of their discretion." *State v. Burke*, 2011 UT App 168, ¶ 42, 256 P.3d 1102, *cert. denied*, 263 P.3d 390 (Utah 2011). *See Gunn Hill Dairy Props., LLC v. Los Angeles Dep't of Water & Power*, 2015 UT App 261, ¶¶ 21, 24, 361 P.3d 703 (Orme, J., concurring, joined by Toomey, J.) (stating that "standards of review really do matter" and that under the abuse of discretion standard, we must affirm cases even when "we think the trial judge made the wrong call" so long as the court's decision is "within the broad range of discretion entrusted to" it), *cert. denied*, 369 P.3d 451 (Utah 2016). We will reverse a district court's rule 403 decision only if "it was beyond the limits of reasonableness." *Boyd*, 2001 UT 30, ¶ 40 (quotation simplified).

¶29　Here, the district court found that the phone recording had "little probative value" because Lewis appeared "hesitant"; his answers were "short, brief," and at times "ambiguous"; and some of the information contained in the recording was "already before the Court and could potentially be provided to a jury without the recorded phone call." Next, it determined that the recording's

probative value was substantially outweighed by the risk of (1) unfair prejudice, (2) confusing the issues, and (3) misleading the jury. Concerning unfair prejudice, the court stated that "given the egregiously unfair nature of the investigative techniques used to obtain the recorded phone call, [Lewis], by law, was not at liberty to fully and confidently respond to and refute the barrage of leading questions asked and confrontational assertions made by" Jane. Because we cannot say that the court's balancing of the recording's probative value against these dangers was "beyond the limits of reasonableness," *id.* (quotation simplified), we affirm the court's decision to exclude the recording under rule 403, as hereafter explained.

¶30 In challenging the court's assessment of probative value, the State makes the following arguments:

- Some of the statements Lewis made during the phone call are "extremely probative" of whether he had sex with Jane without her consent. Specifically, the State points to Lewis's repeated apologies and admissions that what he did was "wrong." And although Lewis denied ever having sex with Jane without first obtaining her consent, he also admitted to "[p]ossibly" having sex with her while she was asleep.

- The recording was strong evidence because it contained Lewis's own words, and a "defendant's own confession is probably the most probative and damaging evidence that can be admitted against him." *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (quotation simplified).

- The State's need for the recording was high because the only other evidence it had was Jane's testimony of Lewis's initial, undetailed admission to her.

- The brief nature of Lewis's responses does not detract from their probative value. "A simple, brief 'yes' to a clear question about a defendant's conduct may be more probative than any other piece of evidence."

- Lewis's statements were "clear responses to clear questions" and were not ambiguous.

And in challenging the court's undue prejudice determination, the State contends that the district court's focus on "the nature of the interrogation" was irrelevant under rule 403 "because it would not lead the jury to decide the issue of whether Lewis raped Jane."

¶31 Although we would not have necessarily reached the same result if in the district court's place, we are not persuaded that the court's ruling constituted an abuse of discretion for several reasons. First, concerning Lewis's repeated apologies and admissions of doing something "wrong" to which the State points, those statements were made in the context of Jane asking him whether he felt guilty about marrying in a religious ceremony that required abstinence from sex. Lewis made no such statements when Jane began more directly discussing rape with him. Thus, such statements that would typically be recognized as admissions of guilt are more ambiguous given the context in which they were made in this case.[7]

---

7. Additionally, Lewis's statement that he "[p]ossibly" had sex with Jane while she was asleep is not the clear-cut proof of rape the State contends. The State asserts that this statement is "extremely probative of the central disputed issue—whether [Lewis] had sex with Jane while she was asleep and therefore without her consent." The State thus appears to be arguing that to obtain a conviction for rape, it had to prove only that Jane was

(continued…)

¶32    Second, given the other avenues of gathering evidence available to the State, it was not unreasonable for the district court to accord less weight to the State's need for the phone recording when evaluating probative value. As discussed above, "if the relative need for the evidence is critical, the court is less likely to exclude it under rule 403." *State v. Nunez-Vasquez*, 2020 UT App 98, ¶ 58, 468 P.3d 585 (quotation simplified), *cert. denied*, 474 P.3d 945 (Utah 2020). Here, the court found that some of the

---

asleep when Lewis had sex with her. But this is not correct. The State would also have had to prove, at the very least, that Lewis was reckless as to Jane's nonconsent. That is, that he "was subjectively aware of but consciously disregarded the risk" that Jane did not consent. *State v. Raheem*, 2024 UT App 29, ¶ 24, 546 P.3d 331 (quotation simplified), *cert. denied*, June 21, 2024 (No. 20240489). *See State v. Barela*, 2015 UT 22, ¶ 26, 349 P.3d 676 ("The crime of rape requires proof not only that a defendant knowingly, intentionally, or recklessly had sexual intercourse, but also that he had the requisite mens rea as to the victim's nonconsent.") (quotation simplified).

This does not mean that Lewis's statement had no probative value in proving that sexual intercourse took place while Jane slept. A jury could reasonably find that Lewis was reckless if, after receiving verbal consent, he realized that Jane had "[p]robably" fallen asleep at some point during the act. On the other hand, the statement is ambiguous as to when Lewis realized that she was "[p]robably" asleep. It is possible he realized this only after the sexual intercourse had ended. All of this is to say that although certainly probative, the admission of the statement was not necessarily a "slam dunk" for the State's case—the State was still required to prove the mens rea element of the crime, which would have had its challenges. And, for reasons discussed in greater detail below, particularly relating to reliability, it was not unreasonable for the district court to minimize the probative value of the statement.

information contained in the recording was "already before the Court and could potentially be provided to a jury without the recorded phone call." Additionally, albeit in the context of its shocks-the-conscience ruling, the court stated that other investigative techniques, such as removing the protective order or interviewing Lewis, were available to the State. The former option seems particularly feasible given Lewis's email to Jane stating that he was willing to talk more with her but that the protective order would need to be lifted so that he could "feel more at ease talking about anything other than the kids." Had the police accepted Lewis's invitation to Jane and pursued that investigative route, they would likely have obtained a second recording that would not have been mired in all the legal infirmities attached to the recording at issue here. Instead, other than unsuccessfully attempting to interview Lewis after the phone call, the police ended the investigation and the State filed charges. Thus, it was not unreasonable for the district court to consider law enforcement's failure to pursue an avenue so readily available to it when considering the State's need for the evidence.

¶33 Third, given the unique circumstances of this case, the reliability of Lewis's statements is questionable, as the district court found. Trial courts may assess the reliability of evidence as part of their rule 403 balancing.[8] *See State v. Fulton*, 742 P.2d 1208, 1218 (Utah 1987) (stating that "Rule 403 can be employed" "to ensure that the jury would not be exposed to unreliable

---

8. Trial courts typically undergo such a reliability analysis under rule 403 when, among other things, eyewitness identification testimony or child testimony are at issue. *See, e.g., State v. Lujan*, 2020 UT 5, ¶ 36, 459 P.3d 992; *State v. Burke*, 2011 UT App 168, ¶ 46, 256 P.3d 1102, *cert. denied*, 263 P.3d 390 (Utah 2011). As discussed above, the unique circumstances in this case likewise raise concerns, albeit on different grounds, as to the reliability of Lewis's statements made during the recorded phone call.

testimony"); *State v. Schreuder*, 726 P.2d 1215, 1225 (Utah 1986) ("The trial court must, as with any evidence, assess the inherent reliability of the testimony, the relevance of the testimony, and undertake a balancing test, particularly of prejudice versus probativeness under Rule 403."). Under rule 403, the reliability of evidence affects both the probative value and unfair prejudice assessments. *See State v. Lujan*, 2020 UT 5, ¶ 36, 459 P.3d 992 (stating that variables relating to the reliability of eyewitness testimony "may be considered in assessing both the probative value . . . and the possibility of it producing unfair prejudice"); *State v. Eldredge*, 773 P.2d 29, 36 (Utah 1989) (stating that under rule 403, "the question is whether the hearsay evidence was sufficiently unreliable that it should have been obvious to the trial judge that the testimony's probativeness was substantially outweighed by its potential for unfair prejudice"); *State v. Wright*, 2021 UT App 7, ¶ 42, 481 P.3d 479 ("[T]he reliability of an eyewitness account determines both its probative value and the possibility that its admission into evidence will result in unfair prejudice."), *cert. denied*, 496 P.3d 718 (Utah 2021).

¶34 Here, the district court was clearly concerned with the manner in which the recording was obtained and the effect this had on the substance and reliability of Lewis's responses.[9] The court stated that Lewis "was not at liberty to fully and confidently respond to and refute the barrage of leading questions asked and confrontational assertions made by" Jane. Lewis's evident hesitancy during the phone call and the shortness of his responses supported the court's concern that he felt constrained from fully answering Jane's questions due to the protective order. Indeed,

---

9. Indeed, the district court's vehement disapproval of and frustration with the active role law enforcement took in the purposeful violation of the district court's protective order is clear in its analysis relating to all three rationales on which it suppressed the recording.

Lewis directly mentioned the protective order at several points during the conversation. Under the protective order, Lewis was limited to communicating with Jane only in written form regarding their children. Lewis even stated at one point that Jane had "leverage" over him because she "could at any moment call the police" regarding the conversation they were having and this made him "extremely uncomfortable." He also twice referenced the risk he was subjecting himself to by speaking with her. Although the county attorney had committed not to prosecute Lewis for violating the protective order, Lewis had no knowledge of this fact at the time of the phone call.

¶35 Lewis thus found himself in a situation where, after he had already violated the protective order by answering Jane's phone call and briefly discussing their children other than in writing, Jane then began asking questions about what happened back in 2006. At that point, Lewis had already subjected himself to possible prosecution and the person who could report him to law enforcement was asking him pointed questions. For this reason, it was reasonable for the district court to infer that Lewis opted to appease Jane by giving brief, limited answers rather than to risk angering her by offering a robust defense and full accounting of his actions. In light of these unique circumstances, it was entirely reasonable for the district court to minimize the recording's probative value and elevate its assessment of the danger of unfair prejudice.[10]

---

10. The State argues that "the nature of the interrogation has nothing to do with rule 403 considerations because it would not lead the jury to decide the issue of whether Lewis raped Jane" and that "[i]t is not unfairly prejudicial for a defendant's own voluntary statements from a recorded confrontation call to be used against him." As discussed above, rather than the fairness of the interrogation, the focus of a rule 403 analysis is on the

(continued…)

¶36 Fourth, the recording carried with it an additional risk of unfair prejudice because it is not possible to present the recorded phone call to the jury without the jury simultaneously finding out about the protective order. Even if Lewis's express references to the protective order were redacted from the recording, it is difficult to imagine how the defense could explain his guarded comments, evident hesitancy, and motivation to placate Jane without having to disclose the protective order. The protective order, which was entered in 2016, is entirely irrelevant as to whether Lewis raped Jane ten years earlier in 2006. On the other hand, referencing the protective order carries a risk that the jury would improperly consider Lewis's later conduct that gave rise to issuance of the protective order. *See Woods v. Zeluff*, 2007 UT App 84, ¶ 7, 158 P.3d 552 (stating that evidence is unfairly prejudicial if it has "an undue tendency to suggest decision on an improper basis, commonly but not necessarily an emotional one, such as bias, sympathy, hatred, contempt, retribution or horror") (quotation simplified). *Cf. State v. Meik*, 2024 UT App 46, ¶ 48, 547 P.3d 878 ("Evidence of bad character or unrelated prior crimes is prejudicial because of the tendency of a fact finder to convict the accused because of bad character rather than because the accused is shown to be guilty of the offenses charged.") (quotation simplified), *petition for cert. filed*, May 29, 2024 (No. 20240558).

¶37 For these reasons, we conclude that the district court did not exceed the bounds of reasonableness when it determined that the risk of, among other things, unfair prejudice substantially outweighed the recording's probative value. The court thus did

---

reliability of the statements and the interplay of probative value and the danger of unfair prejudice. This is distinct from whether the statements were voluntary under the Fifth and Fourteenth Amendments to the United States Constitution. *See State v. Florreich*, 2024 UT App 9, ¶¶ 31–32, 543 P.3d 795, *cert. denied*, 547 P.3d 828 (Utah 2024).

not abuse its discretion in suppressing the recorded phone call under rule 403.

## CONCLUSION

¶38 Although other judges undertaking the same balancing analysis could perhaps have reasonably reached the opposite conclusion, for the foregoing reasons, the district court in this case did not abuse its discretion when it suppressed the phone recording under rule 403 of the Utah Rules of Evidence.

¶39 Affirmed.

——————

TENNEY, Judge, dissenting:

¶40 The majority affirms the district court's decision to suppress Kevin Lewis's recorded statements under rule 403. Under that rule, a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of," among others, "unfair prejudice." Utah R. Evid. 403.

¶41 I see this case very differently from the majority. As explained below, I disagree with the majority's assessments of (A) the probative value of Lewis's recorded statements, (B) the danger of unfair prejudice, and (C) how to balance the two in this case. I therefore respectfully dissent.

A. Probative Value

¶42 The district court concluded that Lewis's recorded statements have "little probative value," and the majority has now affirmed that conclusion. I wholly disagree.

¶43    The starting place for any probative value inquiry should be a determination of what it is, exactly, that the proponent of the evidence must prove. Here, the State has charged Lewis with one count of rape under Utah Code section 76-5-402. The "crime of rape requires proof not only that a defendant 'knowingly, intentionally, or recklessly had sexual intercourse,' but also that he had the requisite mens rea as to the victim's nonconsent." *State v. Barela*, 2015 UT 22, ¶ 26, 349 P.3d 676 (citation omitted). At the preliminary hearing, the State asked the district court to bind Lewis over under Utah Code section 76-5-406(2)(e). Under that particular subsection, an act of sexual intercourse is nonconsensual if "the actor knows the victim is unconscious, unaware that the act is occurring, or is physically unable to resist." *Id.* I'm not aware of a Utah case that has specifically analyzed the mens rea component of this subsection, but its language seems plain enough: by requiring proof of what the actor "knows" at the time of the intercourse, it appears that the State needs to satisfy the *knowing* mens rea to successfully prosecute a defendant for rape under this provision.[11]

¶44    The *knowing* mens rea is defined by the Utah Code. Under its terms, a "person engages in conduct"

> [k]nowingly, or with knowledge, with respect to his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or the existing circumstances. A person acts knowingly, or with knowledge, with respect to a

---

11. The majority suggests that the lesser *recklessness* mens rea might be enough. *Maj. Op.* ¶ 31 n.7. For the reasons I've just given, I think the majority is incorrect on this. In any event, if recklessness is enough, then the analysis I set forth below would be even more applicable.

result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

*Id.* § 76-2-103(2). Applied to the statutory subsection in question, it thus seems that to prove its case, the State must prove that Lewis was "aware" that Jane was either "unconscious, unaware that the act [was] occurring, or [was] physically unable to resist." *Id.* § 76-5-406(2)(e). And, as with any other mens rea question, proof of Lewis's knowledge would be "an inference that may be drawn by the factfinder both from direct and from circumstantial evidence." *State v. Taylor*, 2023 UT App 133, ¶ 20, 539 P.3d 351 (quotation simplified).

¶45   As discussed in the majority opinion, the State is seeking to prove Lewis's mental state through statements he made in a recorded phone call with Jane, who was his ex-wife at the time of the call. A recording of the call was played for the district court at the preliminary hearing, and the audio and a transcript are both in our record. The conversation itself lasted a little over 19 minutes, and the transcript is a little over 7 pages. At the outset of the call, Jane and Lewis had a brief discussion about a few things relating to their children, but Jane then turned the discussion toward the subject of whether Lewis had previously had sexual intercourse with her while she was sleeping. Jane and Lewis discussed that subject for about five and a half pages of transcript.

¶46   There are any number of places in that discussion where Lewis not only acknowledged that the two had sexual intercourse (which is, of course, one of the elements of rape), but also where he demonstrated his awareness that Jane was "unconscious, unaware that the act [was] occurring, or [was] physically unable to resist." Utah Code § 76-5-406(2)(e).

¶47   I'll start with the most direct acknowledgement: at one point in the conversation, Jane asked Lewis, "[D]o you remember when you were going to your self inventory and you shared with

me about having sex with me while I was asleep?" According to the transcript, Lewis responded with an affirmative "Uh-huh." This reads to me like an admission that Lewis had previously told Jane that he had "sex" with her while she was "asleep." From this exchange alone, I think this call has high probative value to the question of whether Lewis was aware that Jane was unconscious when he had sex with her.[12]

¶48 And there was more. Elsewhere in the conversation, Lewis made a number of other statements that either directly or implicitly showed that he was aware that Jane was asleep or at least not fully conscious when he had sex with her.

- In one moment, Jane asked if she "was asleep" when Lewis had sex with her. Lewis responded: "Possibly."

- There was also a series of noteworthy non-denials. At the outset of the conversation, for example, Jane told Lewis that she had been thinking about how he "would have sex

---

12. The majority thinks it's "unclear" whether Lewis really did offer an affirmative "Uh-huh" in response to this question. *Maj. Op.* ¶ 12. Having listened to the audio, the majority believes it "sounds more akin to 'Mmmhmm.'" *Maj. Op.* ¶ 12 n.5.

But the transcriptionist heard and recorded it as an "Uh-huh," and even with the benefit of capable appellate counsel, Lewis hasn't argued on appeal that this was a transcription error and that he actually said something like "Mmmhmm." And for whatever it's worth, I've listened to the audio too, and it sounds more like an affirmative "Uh-huh" to me. Moreover, as I'll point out shortly, the transcriptionist used this same "Uh-huh" to transcribe another moment later in the conversation in which Lewis was also trying to make an affirmative statement. Given the state of our record and the arguments that we've been presented with on appeal, I think this exchange is best understood as it has been presented to us in the transcript.

with [her] while [she] was asleep," and she then said she was "having a really hard time" "get[ting] through that." In response, Lewis didn't deny having told her that. Instead, he said, "[t]hat is stuff that I've worked through for several years" and "it's been dealt with and taken care of, addressed properly. But not with you, I guess." When Jane then asked Lewis why he thought "it was okay to do that to [her] while [she] was asleep," Lewis simply acknowledged that "those thoughts, those patterns were wrong, and that's part of what [he'd] gone through to fix in [his] life and put in [his] past."

- At another point in the conversation, Jane said that she didn't "understand how [she] didn't" become pregnant and that she didn't "understand where [he] came," and she then wondered whether she "missed that too." By asking these questions, Jane seems to have been suggesting that she didn't remember (and had thus been unaware of) when or where Lewis ejaculated. In response, Lewis didn't try reminding her of any moment in which he thought she was conscious when he ejaculated. Instead, he simply assured her that while he didn't use "protection or anything," he had "never" ejaculated inside her.

- There was an exchange toward the end of the conversation in which Jane asked Lewis, "if you loved me why . . . would [you] rape me?" In response, Lewis said that he "didn't view it as that." Then, in an apparent attempt at justifying what he had done, Lewis told Jane that "[a] lot of times" he would ask her if she "wanted it" and that she would "mumble yes" or offer "an uh-huh."[13]

---

13. The transcriptionist used the same "uh-huh" here that the transcriptionist used earlier to reflect Lewis's answer to the

(continued…)

Two things strike me about this particular exchange. First, "[a] lot of times" is not "all of the time." Thus, even under Lewis's justification, it seems that there were some occasions in which he did not ask Jane for her consent. And second, the broader context was that Jane was taking pills that would put her into a deep sleep and Lewis (her fiancé) was there to help her feel safe while she fell asleep. As a result, if all that Jane could do in those substance-aided moments was "mumble yes," I think a jury could readily see this as evidence that Jane wasn't fully conscious (or, perhaps instead, that she was unaware of what was occurring) and that, because Lewis was clearly aware of the pills she had taken and their effect on her, he would have been aware of her lack of consciousness too.

- There were also several exchanges in which Lewis expressed remorse for what he had done. At one point, after Jane had already twice asked Lewis about him having had sex with her while she was "asleep," Jane told Lewis that she was "still suffering with and hurting from" what he had done. Lewis responded by acknowledging that he had done a "lot of wrong things and a lot of bad things." There was another exchange in which Jane asked Lewis, "How did you keep me from knowing?"—a question that expressly contemplated a lack of consciousness on Jane's part. Lewis's response to this pointed question was: "Not sure. It's part of the lies and the secrecy of the addiction, I guess." Given how Jane had started the discussion, Lewis's acknowledgments that he had done "wrong things" and "bad things" and that his behavior involved "lies and . . . secrecy" all stand in obvious tension with any assertion that the two had actually had consensual sex while Jane was conscious. And Lewis's tacit acknowledgment that

---

question of whether he'd previously told Jane that he'd had "sex with [her] while [she] was asleep."

Jane had been kept "from knowing" seems directly indicative that Lewis knew that Jane didn't know what was happening—i.e., that she wasn't conscious when he had sex with her.

¶49    Viewed individually, each of these exchanges has obvious probative value to the question of whether Lewis had the requisite mens rea; viewed together, this is even more so. Based on the statements themselves, I therefore believe that the probative value side of the rule 403 balancing tilts heavily toward admitting Lewis's recorded statements.

¶50    As recognized by the majority, the probative value inquiry also looks to the "proponent's need for the evidence." *Anderson-Wallace v. Rusk*, 2021 UT App 10, ¶ 19, 482 P.3d 822 (quotation simplified), *cert. denied*, 496 P.3d 716 (Utah 2021). The majority believes that this weighs against admissibility. I disagree.

¶51    This is a he-said/she-said rape case. Because the sexual intercourse occurred years earlier (and between two people who knew each other well), there's no physical evidence that could corroborate the allegations—either of the fact of intercourse generally, or of whether Jane had consented. And on both of these questions, Jane's potential testimony would be of limited value, given that, by her own account, she was in drug-assisted sleep when Lewis had sexual intercourse with her and now has only fragmented memories of what occurred.

¶52    This is presumably why law enforcement went to the trouble of facilitating the pretext call that resulted in this recorded conversation. After all, without some statement from Lewis acknowledging what had happened, the State would have little evidence to prove Lewis's mental state. As a result, the State has a pronounced need for this evidence, and this part of the test thus weighs heavily in favor of admissibility.

¶53 Despite all of the above, the majority sees several reasons to affirm the district court's conclusion that the recorded statements lacked probative value. I find none of them to be persuasive.

¶54 Let me first offer something of an overarching response to many of the points raised by the majority. It's true, as the majority points out, that some of our rule 403 cases have allowed courts to assess the reliability of the proposed evidence as part of the rule 403 balancing. *Maj. Op.* ¶ 33. And this makes sense—unreliable evidence would be less probative. But even so, and within the context of the rule 403 balancing, we've still also invoked the familiar distinction between concerns that go to the evidence's weight and those that are so pronounced that they go to its admissibility. *See, e.g., State v. Anderson*, 2020 UT App 135, ¶ 26, 475 P.3d 967; *State v. Burke*, 2011 UT App 168, ¶ 51, 256 P.3d 1102; *State v. Cosey*, 873 P.2d 1177, 1182 (Utah Ct. App. 1994). In this case, even if some of the concerns expressed by the majority might undermine the evidence's reliability in some small measure, I don't believe that any of the identified concerns undermine its reliability so much that it should be deemed inadmissible.

¶55 Turning to the majority's particular assertions, the majority first echoes a series of smaller concerns that were raised by the district court. For example, the majority points out that much of what Lewis said was in response to leading questions. *Maj. Op.* ¶ 34. Fair enough, but I'm not sure why this would weaken the probative value of Lewis's responses so much that his responses lack probative value. After all, leading questions are a staple of trials, and yet juries rely on witnesses' answers to leading questions all the time. The majority also points out that some of Lewis's responses were "short[]." *Maj. Op.* ¶ 34. True, but some of his responses were not particularly short. And even if short, they still added details—during the conversation, Lewis volunteered details about his therapy and his thought patterns, he tried assuring Jane that she had been in no danger of getting pregnant

because he had ejaculated outside her, and he tried justifying what he'd done by explaining how he'd asked for her consent (and had received "mumbled" answers) during many (though not all) of the times that he'd had sex with her. In any event, while a fact-finder might perhaps have some wariness before accepting a clipped answer to an isolated question or two, that's not what we're considering here. What we're considering is an extended conversation that lasted 19 minutes, the bulk of which was spent discussing these allegations. To the extent that some or even many of Lewis's answers were short, they were also repeated. I don't regard their brevity as being a meaningful basis to conclude that Lewis's answers lacked probative value.

¶56 The majority next suggests that Lewis's "repeated apologies" and admissions of having done something "wrong" were narrowly tied to Jane's questions about religious guilt. *Maj. Op.* ¶ 31. At one point early in the exchange, Jane did ask Lewis about his admission that he "would have sex with [her] while [she] was asleep." Before Lewis could respond, Jane continued with a long thought, telling him that one of the things that bothered her was that they "were supposed to be working toward" being worthy for a religious wedding and that she felt "guilt" about what had happened. When Lewis responded to all this, he said, "Well, I am sorry." Unlike the majority, I don't see any real basis for unbundling Jane's concern about the fact that Lewis had sex with her while she was asleep from her concern about the potential religious implications, much less a basis for concluding that Lewis was only apologizing for the latter and not the former. (If that's what Lewis meant, he certainly didn't say so.) And I also find even this proposed distinction potentially damning anyway—by parsing out Jane's question and Lewis's apology in this manner, the majority is apparently positing that Lewis was only expressing remorse for violating Jane's religious scruples, but that he wasn't apologizing in response to her assertion that he'd had sex with her while she was asleep. If he

meant to limit his apology in this manner, I think a jury could reasonably wonder why. In any event, as the conversation continued, Jane kept asking questions about Lewis having had sex with her while she was asleep (and she did so without any continued religious add-ons). In response to one of those questions, Lewis referred to his "lies and the secrecy," thus again demonstrating some acknowledgment of guilt for what she was alleging had happened.

¶57    The majority also downplays the probative value of Lewis's admission that he "[p]ossibly" had sexual intercourse with Jane while she was asleep. *Maj. Op.* ¶ 31 n.7. In the majority's view, Jane was perhaps conscious when the sexual intercourse began but she then fell asleep before Lewis finished. *See id.* But Lewis didn't say anything like this in his response, so this potential line-drawing and this defense is entirely of the majority's creation. Moreover, as I've pointed out, there was also a different moment in the conversation in which Lewis responded with an affirmative "Uh-huh" when Jane asked him if he'd told her that he had "sex with [her] while [she] was asleep." This, too, seems fairly direct. And finally, the question at this stage is whether the recorded call has probative value. Even with the possibility of mid-sex sleep that's now proposed by the majority, I'm having a hard time seeing how Lewis's admission that he "[p]ossibly" had sex with Jane while she was asleep would not at least show that he was aware of her condition—and, thus, that his statements had probative value as to the question of his mental state.

¶58    Finally, there's the concern that really seems to be driving the majority's opinion: namely, the majority's belief that Lewis's recorded statements were not reliable because Lewis knew that he had a protective order hanging over his head. *Maj. Op.* ¶ 33–35. On this, the majority first repeats (and thus seemingly accepts) the district court's conclusion that, because of the protective order, Lewis was "not at liberty to fully and confidently respond to and

refute the barrage" of questions that Jane asked him. *Maj. Op.* ¶ 34. The majority then opines that once Lewis realized that he'd "subjected himself to possible prosecution" for violating the protective order, he now had to "appease" Jane by "giving brief, limited answers" to her questions. *Maj. Op.* ¶ 35.

¶59 It's clear enough from the transcript that Lewis thought there might be a danger of prosecution for a protective order violation—in two moments in the conversation, he mentioned the "risk" that he thought he was taking by talking to Jane. But in light of this expressed concern, I believe that the majority's assessment of the resulting incentives is exactly backwards.

¶60 Lewis was talking to his ex-wife. Jane testified at the preliminary hearing that the two had a "contentious relationship" "[b]asically from 2013 on," and Lewis's own counsel agreed with and even utilized that characterization at several points in these proceedings. Lewis and Jane were also in an ongoing custody battle—Jane testified at the preliminary hearing that she'd "lost count" of how many times she'd been to court relating to those matters. And of some note, Jane testified at the preliminary hearing (in response to a question from Lewis's counsel) that she had made "a few" reports "to both law enforcement and DCFS" against Lewis during the intervening years.

¶61 Against that backdrop, it seems to me that once Lewis realized that he might be on the hook for violating the protective order—and, thus, that Jane might now have some "leverage" over him, *Maj. Op.* ¶ 34—this would have naturally made Lewis more hesitant to say anything potentially incriminating to her, not the other way around.

¶62 It wouldn't require any legal training to understand that having sexual intercourse with someone who's asleep qualifies as rape, nor would it take any keen legal insight to realize that rape is a far more serious criminal offense than violating a protective

order. As a result, since Lewis was apparently worried that Jane might report him for violating the protective order, wouldn't he also be worried that she might report him if he admitted that he'd had sex with her while she was asleep? And wouldn't this give him reason to *not* say anything that resembled a confession to these more serious allegations?

¶63    Put differently, it seems to me that the existence of the protective order, the possibility that Lewis had now violated that protective order, and the history between Lewis and Jane all combine to make what Lewis chose to say anyway even more reliable, not less reliable. And to the extent that the majority (and the district court) have come up with reasons why this might be otherwise, I just don't agree that these concerns are so obvious or compelling that Lewis's otherwise on-point statements in response to Jane's allegations should be deemed so unreliable that they shouldn't be submitted to the jury.[14]

¶64    Finally, on the question of whether the State had any "need for the evidence," *Anderson-Wallace*, 2021 UT App 10, ¶ 19, (quotation simplified), the majority surmises that the State did not

---

14. For similar reasons, I take issue with the district court's assertion (cited with favor by the majority) that, because of the protective order, Lewis was "not at liberty to fully and confidently" respond to Jane's questions and assertions. *Maj. Op.* ¶ 34. Again, even though Lewis was cognizant of the protective order, he was still willing to speak with Jane for 19 minutes. During that discussion, Lewis felt at liberty to tell Jane that he'd received therapy, that he thought her allegations had already been "dealt with," that she had not been at risk of getting pregnant because he'd ejaculated elsewhere, and that he'd asked for and received her consent "a lot" of the time. If he felt at liberty to say all of these things, I don't see why he wouldn't have felt at liberty to instead tell her that he never had sexual intercourse with her while she was asleep if that was the message he wished to convey.

need this evidence because it could have obtained some other evidence of Lewis's intent in some other way. In the majority's view, the State should have tried "removing the protective order" and then having Jane try talking to Lewis in a second call so that the State could obtain "a second recording that would not have been mired in all the legal infirmities attached to the recording at issue here." *Maj. Op.* ¶ 32. I find this suggestion to be equal parts troubling and unconvincing.

¶65    As noted by the majority, *Maj. Op.* ¶ 4 n.3, our record doesn't tell us much about the basis for the protective order. But Jane presumably obtained the protective order by persuading a court that she was entitled to one, and there's been no suggestion (much less a showing) that this protective order never should have been issued. There's also no reason to think that the danger that had prompted the court to issue the protective order had dissipated in the meantime. As a result, the majority is apparently suggesting that Jane should have been required to give up the protections of the protective order that she was entitled to in order to participate in a law-enforcement-supervised phone call as part of an investigation into whether Lewis had also raped her. I find that suggestion to be troubling.

¶66    I also find it to be unpersuasive in terms of how this part of rule 403 operates. The cases that have looked to the proponent's need for the evidence have commonly looked to whether the proponent had some other available evidence that the proponent could instead use to prove the same point. *See, e.g.*, *State v. Maurer*, 770 P.2d 981, 986 (Utah 1989) (looking to whether "the prosecution [had] other evidence available" to prove the element in question); *State v. Northcutt*, 2008 UT App 357, ¶ 16, 195 P.3d 499 (concluding that this part of the rule 403 balancing weighed against admissibility because it "appear[ed] from the record that the State had ample proof" of the same elements without the evidence in question); *State v. Rees*, 2004 UT App 51, ¶ 5, 88 P.3d 359 (concluding that the State needed the evidence because it was

"essentially the only evidence of [the defendant's] intent, other than the victim's speculation"). And there's good reason for viewing this part of the test this way. If the proponent of the evidence can prove the same point with some other evidence that is readily available, then the evidence in question is in some sense cumulative, and to the extent that it is cumulative, it is by definition less probative.

¶67    But here, the majority isn't pointing to anything that is readily available. True, the majority points out that Lewis sent Jane an email after this call in which he told her that if she removed the protective order, he'd be willing to "talk[] more if [she] desire[d]." But that second call never happened. And even if it had been arranged, there's no guarantee that Lewis would have said anything similar to what he said in the first call. Indeed, perhaps having had more time to think about things, Lewis might think differently about the advisability of telling his ex-wife that he'd "[p]ossibly" had sex with her while she was asleep. In any event, this is all purely speculative. And this is why I believe the majority's suggestion is ultimately beside the point. Again, the majority isn't saying that the State has no need for this evidence because the State has other evidence with which it can prove the same elements of the offense. Rather, the majority is saying that the State has no need for this evidence because the majority would prefer that the State had tried collecting other evidence instead. And on that basis, it's affirming the suppression of this evidence, even though the majority's preferred evidence doesn't actually exist and might never exist. I don't believe that this is a proper assessment of how this portion of the rule 403 balancing operates.[15]

_____

15. To the extent that the majority's view on this point is colored by its disapproval of law enforcement allowing (or perhaps even encouraging) Jane to make this pretext call despite the protective

(continued…)

¶68 In sum, I believe that Lewis's recorded statements are highly probative of the central question of this case, which is whether Lewis had the requisite mens rea when he had sexual intercourse with Jane. In addition, the proponent of this evidence (the State) has a pronounced need for these statements because it has no other direct evidence with which it can prove Lewis's intent. Thus, even accounting for the concerns identified by the majority, I have no hesitancy in concluding that these statements have strong probative value.

B.    Danger of Unfair Prejudice

¶69 The other side of the rule 403 balancing asks whether the evidence's probative value "is substantially outweighed by a danger of," among other enumerated things, "unfair prejudice." Utah R. Evid. 403. As with the probative value inquiry, I disagree with the majority's various conclusions on this issue.

¶70 "Because all effective evidence is prejudicial in the sense of being damaging to the party against whom it is offered, rule 403 does not require a court to exclude all prejudicial evidence." *State v. Suhail*, 2023 UT App 15, ¶ 85, 525 P.3d 550 (quotation simplified), *cert. denied*, 531 P.3d 730 (Utah 2023). Instead, the "type of prejudicial evidence that calls for exclusion is evidence that creates an undue tendency to suggest decision on an improper basis, commonly but not necessarily an emotional one, such as bias, sympathy, hatred, contempt, retribution or horror." *Id.* (quotation simplified). In this sense, unfair prejudice refers to the possibility that the evidence might "cause the jury to base its decision on something other than the established propositions of the case." *State v. Lindgren*, 910 P.2d 1268, 1272 (Utah Ct. App. 1996) (quotation simplified).

---

order, I address that concern below in my discussion of the potential for unfair prejudice.

¶71　The majority agrees with the district court's conclusion that there is a danger of unfair prejudice. It offers three areas of concern, all of which stem from the protective order.

¶72　First, the majority initially suggests that "it is not possible to present the recorded phone call to the jury without it simultaneously finding out about the protective order." *Maj. Op.* ¶ 36. I disagree. Lewis and Jane discussed the protective order in two places in this call: in the middle of the conversation, they talked about it in a passage that comprises less than a page of transcript; then, at the end of the call, Lewis referred to the protective order as his reason for ending the conversation. If this call were played for a jury, these portions could easily be redacted. Thus, the evidence that's actually at issue—Lewis's responses to Jane's questions about whether he had sex with her while she was asleep—can indeed be submitted to the jury without the jury ever hearing that the protective order existed.

¶73　Second, the majority acknowledges this redaction possibility, but it then opines that if the jury is not told about the protective order, Lewis would be unable to "explain his guarded comments, apparent hesitancy," and alleged "motivation to placate Jane." *Maj. Op.* ¶ 36.

¶74　As explained above, I'm less persuaded than the majority is that the protective order actually created an incentive for Lewis to falsely incriminate himself to his ex-wife. Beyond that, I'm not persuaded that this particular concern renders these statements inadmissible under rule 403. After all, the State isn't trying to put on evidence of the protective order; rather, the State is trying to put on evidence of the other things that Lewis said during the conversation. As a result, the majority's concern here isn't about unfair prejudice that necessarily flows from the evidence itself; rather, the majority's concern is that Lewis might want to put on evidence of the protective order in response and that Lewis's own proposed evidence about the protective order would then create

unfair prejudice. The majority cites no authority extending the rule 403 unfair prejudice analysis to reactive unfair prejudice of this sort.[16]

¶75  This leaves the final concern, which is a systemic one. The majority points out that the "district court's vehement disapproval of and frustration with the active role law enforcement took in the purposeful violation of the district court's protective order" informed that court's view as to "all three grounds on which it suppressed the recording." *Maj. Op.* ¶ 34 n.9. And the majority apparently disapproves of law enforcement's decision as well. In its analysis of the probative value of the call, for example, the majority says that if prosecutors had "remov[ed] the protective order," this would have removed any "legal infirmities." *Maj. Op.* ¶ 32.

¶76  But I don't believe this is grounds for suppressing Lewis's recorded statements under rule 403. The concern here seems to be that there was something inappropriate about law enforcement approving or even facilitating the commission of one crime (a protective order violation) in order to investigate another (an alleged rape). But by constitutional design, the decision about what to charge and when is a decision left to the executive branch,

---

16. Regardless, even if the unfair prejudice portion of rule 403 can operate in this manner, I don't believe that the unfair prejudice at issue in this case is so pronounced that suppression is warranted. I do agree that in some circumstances, a defendant might be unfairly prejudiced if a jury unnecessarily learns that there was a protective order against the defendant. *See State v. Meik*, 2024 UT App 46, ¶ 34 n.6, 547 P.3d 878, *petition for cert. filed*, May 29, 2024 (No. 20240558). But for the reasons I set forth below in Part C, I believe that any unfair prejudice that would result from the jury learning about the protective order in this case would not outweigh the strong probative value of the statements in question, much less substantially outweigh it.

not the judiciary. As a result, if the appropriate executive branch officials wished to immunize Lewis for a protective order violation, that was their prerogative. I don't see where rule 403 has given the judiciary the supervisory authority to retroactively tell the county attorney that he could not approve this investigatory tactic.

¶77 Beyond the systemic construct, I'm also less convinced than the majority is that this was necessarily problematic. After all, it's not unheard of (much less inappropriate) for law enforcement officials to countenance the commission of a lesser crime in order to investigate a more serious one. This is something of a staple of undercover operations. And while there are obviously complicated dynamics at play in such decisions, those complicated dynamics are the reason that such decisions are best left to the political actors. As a result, courts have been appropriately wary of holding that undercover operations (even those that involve some law breaking) can't be approved. *See, e.g.,* *United States v. Russell*, 411 U.S. 423, 430–32 (1973) (holding that supplying the ingredients for drug-manufacturing would be a "permissible means of investigation" that "stops far short of violating that fundamental fairness, shocking to the universal sense of justice" (quotation simplified)); *see also United States v. Mosley*, 965 F.2d 906, 910 (10th Cir. 1992) ("Government agents often need to play the role of criminals in order to apprehend criminals, and this role occasionally entails unseemly behavior."). And that's essentially what happened here. Although Jane had a protective order against Lewis, the county attorney decided that it was worth countenancing a potential violation of that protective order in order to investigate whether Lewis had committed the much more serious offense of rape. Yet with this opinion, the majority is essentially suggesting that the county attorney couldn't do that.

¶78 Even if it were somehow true that this was improper, I'm not convinced that rule 403 is the vehicle by which the judiciary

can say so. Separate from its rule 403 analysis, the district court concluded that, because of how the protective order interfaced with this phone call, Lewis's statements were both (i) involuntary and (ii) obtained in violation of due process under a "shocks-the-conscience" rubric. Those seem to me to be much more natural analytical places for the courts to consider whether evidence was collected in an unlawful manner—and, if so, whether the evidence should be suppressed as a result.

¶79 But the majority has chosen to affirm the district court only on the ground that the statements were inadmissible under rule 403. And I see this choice as being problematic. Our supreme court has pulled back from previous extra-textual additions to rule 403, holding that "the governing legal standard for evaluating whether evidence satisfies rule 403 is the plain language of the rule, nothing more and nothing less." *State v. Cuttler*, 2015 UT 95, ¶ 2, 367 P.3d 981. On its face, the text of the rule, as relevant here, simply asks whether the probative value of the evidence in question is substantially outweighed by the danger of unfair prejudice. And in fidelity to that text, Utah cases have commonly held that the "unfair prejudice" component looks to whether the evidence might prompt *the jury* to judge the case on some improper basis. *See, e.g.*, *State v. Green*, 2023 UT 10, ¶ 78, 532 P.3d 930; *Suhail*, 2023 UT App 15, ¶ 85; *State v. Bryson*, 2018 UT App 111, ¶ 13, 427 P.3d 530. Here, the majority does not explain why the jury would be more likely to convict Lewis based on the improper basis of the jury thinking that law enforcement should not have allowed Jane to make this call. If anything, this again seems backwards.

¶80 As a result, to the extent that the majority's unfair prejudice analysis rests on its concerns about the impropriety of this investigatory tactic, I believe that the majority is answering a different question than the one that is posed by rule 403. I thus disagree with its decision to employ this rule in this manner.

C.     Balancing

¶81    This leads to the ultimate question, which is how to balance the probative value of Lewis's statements against the danger of unfair prejudice.

¶82    As the majority correctly points out, the district court's ruling is subject to the abuse of discretion standard of review. *Maj. Op.* ¶ 28. This is a deferential standard of review, and appellate courts should not lightly conclude that there has been an abuse of discretion.

¶83    But for purposes of our review in this case, it also matters that the rule at issue has placed its own internal thumb on the scale. Again, rule 403 states that a court may exclude relevant evidence if the probative value is "*substantially* outweighed" by the danger of unfair prejudice. Utah R. Evid. 403 (emphasis added). Because of this, we've held that rule 403 "is an inclusionary rule" that imposes a "heavy burden" on the party who seeks to exclude the evidence in question. *State v. Smith*, 2019 UT App 141, ¶ 35, 449 P.3d 971 (quotation simplified). And when "conducting a rule 403 analysis, courts generally indulge a presumption in favor of admissibility." *State v. Granere*, 2024 UT App 1, ¶ 80, 543 P.3d 177 (quotation simplified); *accord Green*, 2023 UT 10, ¶ 78.

¶84    So viewed, I believe that it was an abuse of discretion for the district court to suppress these statements. Again, the State is seeking to admit portions of a recorded conversation in which Lewis made a number of statements that either outright confirm or at least suggest that he knew that his fiancée was asleep when he had sexual intercourse with her. This is highly probative evidence, and it's central to the State's case. Even accounting for the possibility that, because of the circumstances, the jury might learn that Lewis had a protective order against him, and even accounting for the possibility that Lewis might suffer some unfair

prejudice as a result, I don't believe that this kind of evidence is so inflammatory that it would necessarily "cause the jury to base its decision on something other than the established propositions of the case." *Lindgren*, 910 P.2d at 1272 (quotation simplified).

¶85    In short, I don't believe that the danger of unfair prejudice even outweighs the probative value of the evidence in question, much less that it substantially outweighs it. As a result, I would reverse the district court's decision to suppress these statements under rule 403, and I would then reach the other issues presented by the State in its appeal.

¶86    I respectfully dissent.

——————